1  GERGOSIAN & GRALEWSKI LLP
   EDWARD M. GERGOSIAN (105679)
2  ROBERT J. GRALEWSKI, JR. (196410)
   655 West Broadway, Suite 1410
3  San Diego, California 92101
   Telephone:  (619) 237-9500
4  Facsimile:   (619) 237-9555

5  AUDET & PARTNERS, LLP
   MICHAEL MCSHANE (127944)
6  221 Main Street, Suite 1460
   San Francisco, CA 94105
7  Telephone: (415) 568-2555
   Facsimile: (415) 568-2556

8

   *Attorneys for Plaintiff Karin Jacobs*
9

10

11              UNITED STATES DISTRICT COURT

12              SOUTHERN DISTRICT OF CALIFORNIA

13 | Karin Jacobs, on Behalf of Herself and All | Case No. '08 CV 0594 JS CAB
14 | Others Similarly Situated,                 |
                                                | CLASS ACTION
15 |                     Plaintiff,              |
                                                | COMPLAINT
16 |            v.                               |
                                                | JURY TRIAL DEMANDED
17 | THE HERSHEY COMPANY, HERSHEY               |
18 | CANADA INC.; MARS, INC., MARS             |
     CANADA INC., MASTERFOODS USA,
19 | NESTLE S.A., NESTLE USA, NESTLE           |
     CANADA INC., CADBURY SCHWEPPES
20 | PLC, CADBURY SCHWEPPES                     |
     AMERICAS, CADBURY ADAMS USA
21 | LLC, CADBURY ADAMS CANADA                 |
     INC., ITWAL LTD.,
22 |                     Defendant.             |

23

24

25

26

27

28

COMPLAINT

1       Plaintiff Karin Jacobs ("Plaintiff"), on behalf of herself and all others similarly

2 situated, brings this action under the federal antitrust laws, and in particular section 1 of

3 the Sherman Antitrust Act of 1890, 15 U.S.C. §1 ("Sherman Act"), against the named

4 defendants.  The allegations are on information and belief, except as to those that

5 concern the plaintiff, which are based upon personal knowledge.  Plaintiff's information

6 and belief are based on, *inter alia*, the investigation made by her attorneys.

7 **NATURE OF CLAIM**

8     1.     This case arises because the world's leading manufacturers of chocolate have

9 teamed up to fix, raise, maintain, and/or stabilize prices of chocolate in the worldwide chocolate

10 market, including in the United States.

11     2.     "Chocolate" includes packaged chocolate bars and similar products, industrial

12 chocolate (melted and powdered chocolate made after processing cocoa beans sold to create a

13 final product), and block chocolate.

14     3.     Defendants together control almost 50 percent of the worldwide market for

15 chocolate, and about 80 percent of the chocolate market in the United States.

16 **JURISDICTION AND VENUE**

17     4.     This action arises under Section 1 of the Sherman Act.

18     5.     Jurisdiction is founded on Section 4 of the Sherman Act, 15 U.S.C. §4, for

19 violations of Section 1 of the Sherman Act, 15 U.S.C. §1, and 28 U.S.C. §§1331, 1337.

20     6.     Venue is proper in the Southern District of California, pursuant to Section 22 of

21 the Sherman Act, and 28 U.S.C. § 1391(b) and (c), because one or more of the defendants'

22 principal places of business is here, because all defendants are found and transact business in

23 this district and/or the claims arose at least in part in this district.  Defendants regularly and

24 continuously conduct business in interstate and foreign commerce between and among the

25 several United States and foreign countries.  The interstate trade and commerce described herein

26 has been carried out, in part, within this district.

27 //

28 //

1

**PARTIES**

7.     Plaintiff's resides in Medina, Minnesota.  Plaintiff purchased chocolate directly from one or more of the defendants during the class period defined below.  Plaintiff has been damaged as a result of defendants' unlawful conduct.

8.     Defendant The Hershey Company is a Delaware corporation headquartered at 100 Crystal A Drive, Hershey, Pennsylvania 17033.  The Hershey Company is the top-selling manufacturer of Chocolate in the United States and accounts for 45 percent of the U.S. Chocolate market.  During the class period, The Hershey Company, directly or through its subsidiaries or affiliates, manufactured and sold chocolate to customers at anticompetitive prices that were inflated by reason of defendants' unlawful conduct.

9.     Defendant Hershey Canada Inc. is a wholly owned subsidiary of The Hershey Company, located at 2350 Matheson Bird E, Mississauga ON, L4W 5E9.  Hershey Canada manufactures, distributes and sells confectionery, snack, refreshment and grocery products, including chocolate.   During the class period, Hershey Canada directly or through its subsidiaries or affiliates, manufactured and sold chocolate to customers at anticompetitive prices which were inflated by reason of defendants' unlawful conduct.  The Hershey entities identified herein are "Hershey".

10.     Defendant Mars, Incorporated is a privately held corporation entirely owned by the Mars family and headquartered at 6885 Elm Street, McLean, Virginia 22101.  During the class period, Mars, directly or through its subsidiaries or affiliates, manufactured and sold chocolate to customers at anticompetitive prices inflated by defendants' unlawful conduct.

11.     Mars Canada Inc., formerly Effem Inc., is a division of Mars, Incorporated. Headquartered at 27 Holland Dr, Bolton, ON L7E 5S4, Mars Canada employs more than 700 associates at three sites, including three manufacturing facilities.  During the class period, Mars Canada, Inc. directly or through its subsidiaries or affiliates, manufactured and sold chocolate to customers at anticompetitive prices inflated by defendants' unlawful conduct.  The Mars entities identified herein are "Mars".

COMPLAINT

1    12.    Defendant Masterfoods USA ("Masterfoods") is headquartered at 800 High

2  Street, Hackettstown, New Jersey 07840.  Masterfoods conducts Mars' U.S. food, snack and pet

3  care operations.  During the class period, Masterfoods, directly or through its subsidiaries or

4  affiliates, manufactured and sold chocolate to customers at anticompetitive prices inflated by

5  defendants' unlawful conduct.

6    13.    Defendant Nestle S.A. is a Vevey-Switzertand based multinational packaged

7  food  company  that  manufactures  confectionery  products,  including  chocolate.    It  is

8  headquartered at Avenue Nestle 5, CH-1800, Vevey, Vaud, Switzerland.  During the class

9  period, Nestle S.A., directly or through its subsidiaries or affiliates, manufactured and sold

10  chocolate to customers at anticompetitive prices inflated by defendants' unlawful conduct.

11    14.    Defendant Nestle USA is a Delaware corporation with its principal place of

12  business at 800 N Brand Boulevard, Glendale, California 91203. Nestle USA had sales of $8.5

13  billion in 2006.  During the class period, Nestle USA directly or through its subsidiaries or

14  affiliates, manufactured and sold chocolate to customers at anticompetitive prices inflated by

15  defendants' unlawful conduct.

16    15.    Nestlé Canada Inc., a principal subsidiary of Nestle S.A., is headquartered at 25

17  Sheppard  Avenue  West,  North  York,  Ontario,  M2N  6S8,  Canada.    Nestle  Canada  Inc.

18  manufacturers chocolate and other cocoa products.  During the class period, Nestle Canada,

19  Inc.,  directly  or  through  its  subsidiaries  or  affiliates,  manufactured  and  sold  chocolate  to

20  customers at anticompetitive prices inflated by defendants' unlawful conduct.   The Nestle

21  entities identified herein are "Nestle".

22    16.    Defendant Cadbury Schweppes plc is a confectionery and beverage company

23  headquartered  at  25  Berkeley  Square,  London,  WlJ  6HB,  United  Kingdom.    Cadbury

24  Schweppes plc sells its products in the U.S. through a licensing agreement with Hershey.

25  During  the  class  period,  Cadbury  Schweppes  plc,  directly  or  through  its  subsidiaries  or

26  affiliates, manufactured and sold chocolate to customers at anticompetitive prices inflated by

27  defendants' unlawful conduct.

28

COMPLAINT

17.     Defendant Cadbury Schweppes Americas is headquartered at 5301 Legacy Drive, Plano, Texas 75024. During the class period, Cadbury Schweppes Americas, directly or through its subsidiaries or affiliates, manufactured and sold chocolate to customers at anticompetitive prices inflated by defendants' unlawful conduct.

18.     Defendant Cadbury Adams USA LLC, headquartered at 389 Interpace Parkway Ste 1, Parsippany, New Jersey 07054, is Cadbury Schweppes' confectionery unit in the United States. During the class period, Cadbury Adams USA LLC, directly or through its subsidiaries or affiliates, manufactured and sold chocolate to customers at anticompetitive prices inflated by defendants' unlawful conduct.

19.     Cadbury Adams Canada, Inc. is Canada's largest confectionery company. Headquartered at 5000 Yonge St Suite 2100, Toronto, ON, M2N 7E9, Cadbury Adams is a subsidiary of Cadbury Schweppes plc. During the class period, Cadbury Adams Canada, Inc., directly or through its subsidiaries or affiliates, manufactured and sold chocolate to customers at anticompetitive prices inflated by defendants' unlawful conduct. The Cadbury entities identified herein are "Cadbury".

20.     ITWAL Ltd. ("ITWAL"), headquartered at 440 Railside Drive Brampton, Ontario L7A 1 L1 Canada, is a national network of independent, diversified retail and food service wholesale distributors. During the class period, ITWAL was aware of, coordinated and facilitated the unlawful conspiracy alleged herein.

### UNNAMED CO-CONSPIRATORS

21.     On information and belief, other entities such as chocolate manufacturers or trade associations are co-conspirators with defendants in their unlawful restraint of trade. These co-conspirators have facilitated, adhered to, participated in, and/or communicated with others regarding the conspiracy. These co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade.

### INTERSTATE TRADE AND COMMERCE

22.     Throughout the class period, there has been a continuous and uninterrupted flow of transactions in and shipments of chocolate by defendants in interstate and international

4

1  commerce throughout the United States and the world.

2      23.    The unlawful activities of defendants and the unnamed co-conspirators have

3  been within the flow of, and have had a direct, substantial, and reasonably foreseeable effect on

4  interstate and international commerce.

5  **FACTS**

6      24.    Chocolate is a commodity product that is uniform. It does not vary materially

7  depending upon manufacturer. The chocolate produced by any defendant is fungible with any

8  other defendant's chocolate. For example, chocolate bars manufactured by the various

9  defendants are sold on similar terms and in similar quantities. From a pricing perspective,

10  chocolate bars are a relatively undifferentiated product.

11      25.    Commencing on or around February 1, 2002, defendants conspired, contracted or

12  combined among themselves and with others, for the purpose of and with the effect of raising,

13  fixing, pegging, maintaining or stabilizing the price of chocolate and other commercial

14  conditions for deliveries of chocolate purchased by the class.

15      26.    The chocolate industry in the United States and worldwide is highly

16  concentrated, which facilitates the coordination of prices of chocolate.

17      27.    Defendants collectively are the principal manufacturers of chocolate in the US

18  and worldwide.

19      28.    According to published sources, three defendant manufacturers represent over 80

20  percent of the chocolate market in the United States. Hershey's market share is estimated at 47

21  percent, Mars' at 27 percent, and Nestle's at 9 percent.

22      29.    Defendants also control almost one-half of the global chocolate market. Mars has

23  approximately 15 percent, Nestle has almost 13 percent, Hershey has approximately 8 percent,

24  and Cadbury has approximately 8 percent of this market.

25      30.    The North American chocolate market is highly integrated both in terms of trade

26  and pricing.

27      31.    Chocolate and other confectionery products in the United States often originate

28  from and may be priced in Canada. The world's top four chocolate bar manufacturers have

5

1  productions facilities in Canada.  For example Hershey has a manufacturing facility in Smiths

2  Falls, Ontario, that supplies chocolate to the US market.  (All of Hershey's other facilities are in

3  the United States.)  Defendant firms have invested in Canada to obtain lower sugar costs than

4  they would receive in the United States, and also to be able to import their chocolate into the

5  United States under the low tariff NAFTA treaty.

6      32.    In 2005 Canada exported over $1 billion in confectionery products to the United

7  States.  Roughly half of that number consisted of chocolate candy.  Canada accounts for over

8  30% of the total imports to the United States of the Sugar and Confectionery Product

9  Manufacturing industry (of which chocolate is a substantial part).

10     33.    Chocolate and other confectionery products in Canada also originate from and

11 may be priced in the United States.  According to the US Department of Agriculture, the United

12 States is Canada's largest supplier of confectionery products, accounting for 61 percent of the

13 value and 65 percent of the volume of Canadian imports in 2004.  The United States supplied 45

14 percent of Canadian chocolate candy in 2004.  In 2006, the Sugar and Confectionery Product

15 Manufacturing industry (of which chocolate is a substantial part) exported approximately $700

16 million to Canada.

17     34.    Defendants make pricing decisions for chocolate centrally as opposed to region

18 by region. As recently stated by Cadbury CEO Todd Stitzer, "We are in the process of

19 implementing price increases in **most of our markets** …" (emphasis added).

20     35.    In recent years, changing consumer preferences and rising costs have hurt the

21 chocolate industry. Yet, according to Packaged Facts, an industry publication, the United States

22 market for chocolate rose to a record-setting $16 billion in 2006.  Much of that increase in 2006

23 was achieved by price increases, not increased unit sales.  A significant percentage of that $16

24 billion comprises chocolate imported from Canada.

25     36.    In the face of these negative market trends, defendants, the dominant players in

26 the United States chocolate market, responded, in part, by instituting uniform price increases.

27     37.    In March of 2007, Masterfoods increased wholesale prices of well-known

28 chocolate bars by approximately five percent.  The company cited rising costs as the basis for

6

1     the price increase.

2          38.     In April 2007, Hershey raised wholesale prices of similar items by 4 percent to 5

3     percent.

4          39.     Contrary to the decline in sales that normally would follow a price increase under

5     competitive conditions, Hershey announced that it expected the price increase to have "minimal

6     financial impact."

7          40.     Prudential analyst John M. McMillin estimated the increase translates to about a

8     nickel a bar, and noted that British competitor Cadbury recently raised prices and privately held

9     competitor Masterfoods, which makes M&Ms and Mars candy bars like Snickers and 3

10     Musketeers, "is also taking pricing up, so Hershey is not out there alone, we think, in this

11     chocolate price increase."

12          41.     On October 10, 2007 Cadbury CEO Todd Stitzer said the company expected

13     ingredients to cost 5% to 6% more in 2008 because of rising commodity prices. "We are in the

14     process of implementing price increases in most of our markets to offset these increases," he

15     said.

16          42.     When Nestlé, which makes Nestlé Crunch and Baby Ruth candy bars, addressed

17     investors the following week, the company's head of investor relations also discussed raising

18     prices because of commodity prices.

19          43.     Shortly thereafter, Hershey boosted its wholesale prices by about 3 percent on

20     one-third of its domestic candy line, covering standard chocolate bars, king-size bars, 6-packs

21     and vending lines.

22          44.     Many, if not all, of the price increases made by defendants during the class

23     period were made pursuant to the unlawful price fixing conspiracy alleged herein.

24          45.     In July 2007, Canada's Competition Bureau (the "Competition Bureau") initiated

25     an investigation into the Chocolate market based on information provided by a company

26     involved in the conspiracy.

27          46.     Recently, Ontario's Superior Court of Justice, East Region, issued search

28     warrants to the Competition Bureau to investigate a scheme to fix the prices of chocolate among

1  Hershey, Mars, Nestle, and Cadbury.  Affidavits signed by an attorney in the Competition

2  Bureau stated that the affiant has "reasonable grounds to believe and does believe that ...

3  Hershey, Mars, Nestle and other persons known and unknown…did conspire, combine, agree or

4  arrange with each other … to enhance unreasonably the price of chocolate confectionery

5  products in Canada ..." and "to prevent or lessen, unduly, competition in the supply of

6  chocolate confectionery products in Canada."

7        47.    The Competition Bureau filed the affidavits in support of a request for a warrant

8  to search Canadian offices of Hershey, Mars, Nestlé and ITWAL. Cadbury Schweppes PLC of

9  London, Canada's largest chocolate maker as of 2005, is not named in the request.

10       48.    The affidavits aver that senior executives at Hershey, Mars and Nestle met

11  secretly in coffee shops, restaurants and at industry conventions to set prices.  Certain of these

12  meetings took place at the Auberge de Pommier restaurant in July 2007 in Toronto and at food

13  conventions in Vancouver and Niagra-on-the-Lake, Ontario in 2007.

14       49.    The search warrants required some of the defendants (but not Cadbury) to

15  surrender thousands of documents and computer files that pertain to their chocolate pricing

16  arrangements.

17       50.    Nestle, Cadbury, and Hershey have each acknowledged that the Competition

18  Bureau has contacted them in connection with an investigation of unlawful conduct.

19       51.    John Pecman, the Competition Bureau's assistant deputy commissioner in the

20  criminal division, stated that the Competition Bureau "can confirm that [it is] investigating

21  alleged anticompetitive practices in the chocolate confectionery industry," and that "the volume

22  of commerce affected [] is definitely potentially in the billions of dollars per year."

23       52.    According to the affidavits, the conspiracy involved the highest ranking

24  executives within each defendant company.  Robert Leonidas, Nestle's chief executive officer,

25  is alleged to have told a competitor, "We are going to take a price increase and I want you to

26  hear it from the top."

27       53.    Discussions over price-fixing continued for several years, according to the

28  affidavits.  Last July, a witness for one of the conspirators met Sandra Martinez de Arevalo,

8

1   president of Nestlé Canada's confectionery business, for lunch at Auberge du Pommier.

2   According to the witness' account, Ms. Martinez suggested that the witness' company "lead a

3   price increase in 2007, as Nestlé wanted to take a price increase in the third quarter." The

4   witness said he answered that his company was not prepared to take a price increase in 2007,

5   but might in 2008.

6       54.    Another witness said he was approached on September 27, 2007 by Eric Lent,

7   General Manager of Hershey Canada, at a trade association meeting. As he was getting ready to

8   sit down at the dinner table, this witness said, Mr. Lent approached him and said Nestlé was

9   "taking a price increase" and "so we should take advantage" or "we should increase our prices

10   too." According to the court document, Mr. Lent continued: "Bob [Leonidas] and I talk about it

11   all the time. It's public knowledge that Nestlé is taking its prices up."

12       55.    During the conspiracy, Bob Leonidas, Nestle chief executive, is alleged to have

13   handed envelopes stuffed with pricing information to a competitor with an instruction that the

14   competitor avoid being seen picking up the information at Nestle's offices.

15       56.    The affidavits also provided evidence that ITWAL worked with the chocolate

16   companies to force retailers to stop cutting prices for chocolate bars. Defendants threatened to

17   cut off the supply of chocolate to retailers that did not comply with its established pricing

18   requirements. ITWAL's president also allegedly sent regular updates to participants of the

19   conspiracy. For example, the Vice President and General Manager of ITWAL called one of the

20   companies and advised them that a competitor would be taking a price increase in 2008.

21       57.    In one memorandum to the chocolate manufacturer defendants entitled, "TAKE

22   ACTION NOW," ITWAL explained that "[a]t the end of the day, it is only the suppliers'

23   control and discipline of the [discounting] that can restore the functionality of the marketplace."

24       58.    Another ITWAL Bulletin from April 5, 2002, sent to Cadbury, Mars, Hershey,

25   Nestle and Mars personnel, states that, "Together we can correct this destabilizing,

26   dysfunctional and unprofitable practice [of cutting chocolate prices]. Let's get it done."

27       59.    The U.S. Department of Justice's antitrust division has begun its own inquiry

28   into defendants' unlawful pricing practices in the United States chocolate market.

1    60.    Nestle USA and Mars Inc. have acknowledged the inquiry and stated that they

2  will cooperate with the separate Justice Department inquiry into their US pricing practices.

3    61.    In mid-February German investigators raided the offices of several major

4  confectionery companies amid allegations they fixed the price of chocolate. According to

5  published sources, the companies Mars, Nestlé, Kraft and Ritter have all confirmed they are part

6  of the investigation by the (German) Federal Cartel Office. "We think there was collusion on

7  price rises," said a spokeswoman for the cartel office, adding that the investigation is expected

8  to take several months.

9    62.    Aside from the unlawful conspiratorial meetings specifically alleged above,

10  defendants also had additional opportunities to conspire. Defendants are members of the

11  Chocolate Manufacturers Association ("CMA") and the National Confectioners Association

12  ("NCA"), which sponsored meetings that defendants attended during the class period. The

13  CMA, headquartered in Vienna, Virginia, has served as the premier trade group for

14  manufacturers and distributors of cocoa and chocolate products in the United States. CMA

15  members produce over 90% of the Chocolate processed in the United States. The NCA is a

16  trade association that represents the entire confection industry. It is one of the oldest trade

17  associations in the world.

18                    **ALLEGATION OF ANTITRUST INJURY**

19    63.    The combination and conspiracy alleged herein had and is having the following

20  effects, among others:

21        a.    Prices for chocolate charged to plaintiff and the class have been fixed or

22  stabilized artificially derived, non-competitive levels;

23        b.    Plaintiff and the class have been deprived of the benefits of free, open

24  and unrestricted competition in the market for chocolate; and

25        c.    Competition in establishing the prices paid in the United States and

26  worldwide for chocolate has been unlawfully restrained, suppressed and eliminated.

27    64.    Plaintiff and the class members have sustained injury to their property or

28  business as a result of defendants' illegal and anticompetitive conduct. The injury sustained by

1   the plaintiff and the class is the payment of supracompetitive prices for chocolate as a result of

2   defendants' illegal contract, combination, and conspiracy to restrain trade as alleged.

3   **FRAUDULENT CONCEALMENT**

4        65.    Defendants fraudulently concealed their participation in the conspiracy alleged

5   herein by, *inter alia*, engaging in secret meetings and communications in furtherance of the

6   conspiracy, and by holding themselves out as competitors to the public, to plaintiff, and to the

7   class. Because of the fraudulent concealment, and that a price fixing conspiracy is inherently

8   self-concealing, plaintiff and the class could not have discovered the existence of this

9   conspiracy any earlier than its public disclosure.

10   **CLASS ACTION ALLEGATIONS**

11        66.    Plaintiff brings this action as a class action under Rules 23(a), (b)(2) and 23(b)(3)

12   of the Federal Rules of Civil Procedure, on behalf of themselves and others similarly situated.

13   The "Class" is defined as:

14           All persons or entities who purchased chocolate directly from the defendants or
    their co-conspirators (the "class"), at any time from at least February 1, 2002 to

15           date (the "class period"). Excluded are defendants, any subsidiaries or affiliates
    of defendants, and any of defendants' co-conspirators, whether or not named as a

16           defendant in this complaint.

17        67.    The class is so numerous that joinder of all members is impracticable. Given the

18   characteristics of the chocolate market, plaintiff believes that the members of the class are

19   geographically dispersed throughout the world, including throughout the United States, and that

20   joinder of all class members would be impracticable. The exact number of class members is

21   unknown to plaintiff at this time, but plaintiff believes that there are, at least, thousands of

22   members and that their identities can be learned from defendants' books and records or from

23   other sources.

24        68.    Plaintiff's claims are typical of the claims of the other members of the class.

25   Plaintiff and members of the class purchased chocolate at artificially maintained,

26   non-competitive prices established by defendants and their unnamed co-conspirators in

27   connection with the restraint of trade alleged herein. Plaintiff and members of the class have

28   sustained damage by payment of inflated prices for the chocolate products at issue due to

11

1    defendants' conduct in violations of federal law as alleged.

2          69.    Plaintiff will fairly and adequately protect the interests of the members of the

3    class and has retained counsel competent and experienced in class action and antitrust litigation.

4          70.    Common questions of law and fact exist as to all members of the class that

5    predominate over questions affecting solely individual members of the class.    Among the

6    questions of law and fact common to the class are:

7          Section 1.01    Whether defendants conspired, contracted or combined with others, for

8    the purpose of and with the effect of raising, fixing, maintaining, pegging, or stabilizing the

9    price of chocolate purchased by the class;

10         Section 1.02    Whether defendants undertook actions to conceal the unlawful

11   conspiracies, contracts or combinations described herein and;

12         Section 1.03    Whether defendants' conduct violated the relevant federal antitrust laws

13   and caused injury to the business and property of plaintiff and the class and, if so, the proper

14   measure of damages.

15         71.    A class action is superior to other available methods for the fair and efficient

16   adjudication of this controversy as joinder of all class members is impracticable.    The

17   prosecution of separate actions by individual members of the class would impose heavy burdens

18   upon the courts and defendants, and would create a risk of inconsistent or varying adjudications

19   of the questions of law and fact common to the class.    A class action will achieve substantial

20   economies of time, effort and expense, and would assure uniformity of decision as to persons

21   similarly situated without sacrificing procedural fairness or bringing about other undesirable

22   results.

23         72.    The interest of members of the class in individually controlling the prosecution

24   of separate actions is theoretical rather than practical.    The class has a high degree of cohesion,

25   and prosecution of the action through representatives would be unobjectionable.    The amounts

26   at stake for class members, while substantial in the aggregate, may not be great enough

27   individually to enable them to maintain separate suits against defendants.    Plaintiff does not

28   anticipate any difficulty in the management of this action as a class action.

**COUNT I**
**VIOLATIONS OF SECTION 1**
**OF THE SHERMAN ACT**

73.    Plaintiff incorporates by reference the foregoing allegations.

74.    Defendants and the unnamed co-conspirators entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

75.    The contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among defendants and their co-conspirators in furtherance of which defendants fixed, maintained, and standardized prices for chocolate. Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

76.    Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among defendants and the co-conspirators.    These co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

77.    The contract, combination or conspiracy has had the following effects:

a.    Prices for chocolate charged to plaintiff and the class were fixed or stabilized at higher, artificially derived, non-competitive levels;

Section 1.04    Plaintiff and the class have been deprived of the benefits of free, open and unrestricted competition in the market for chocolate; and

Section 1.05    Competition in establishing the prices for chocolate and allocating customers and territorial markets for chocolate has been unlawfully restrained, suppressed and eliminated.

78.    As a proximate result of defendants' unlawful conduct, plaintiff and the class have suffered injury in that they have paid supracompetitive prices for chocolate.

13

COMPLAINT

**DEMAND FOR JURY TRIAL**

79.    Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief as follows:

a.    That the court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that plaintiff be appointed as class representatives and that Plaintiff's counsel be appointed as counsel for the class;

b.    That the unlawful contract, combination and conspiracy alleged be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act and that such unlawful conduct be enjoined thereunder;

c.    That plaintiff and the class recover compensatory damages, as provided by Section 4 of the Clayton Antitrust Act of 1914, 15 U.S.C. §15, determined to have been sustained as to each of them, and that judgment be entered against defendants on behalf of plaintiff and each and every member of the class;

d.    That plaintiff and the class recover treble damages, as provided by Section 4 of the Clayton Antitrust Act of 1914, 15 U.S.C. §15;

e.    That plaintiff and the class recover their costs of the suit, including attorneys' fees, as provided by law; and

f.    For such further relief as the Court may deem just and proper.

DATED: April 1, 2008

Respectfully submitted by:

GERGOSIAN & GRALEWSKI LLP
Edward M. Gergosian
Robert J. Gralewski, Jr.

Robert J. Gralewski, Jr.

655 West Broadway, Suite 1410
San Diego, CA 92101
Tel: (619) 237-9500

14

COMPLAINT

1    AUDET & PARTNERS, LLP
     Michael McShane
2    221 Main Street, Suite 1460
     San Francisco, CA 94105
3    Tel: (415) 568-2555

4    *Attorneys for Plaintiff Karin Jacobs*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15

COMPLAINT

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM)

## I (a) PLAINTIFFS

KARIN JACOBS, on behalf of herself and all others similarly situated,

## DEFENDANTS

THE HERSHEY COMPANY, HERSHEY CANADA INC.; MARS, INC., MARS CANADA INC., MASTERFOODS USA, NESTLE S.A., NESTLE USA, NESTLE CANADA INC., CADBURY SCHWEPPES PLC, CADBURY SCHWEPPES AMERICAS, CADBURY ADAMS USA LLC, CADBURY ADAMS CANADA INC., ITWAL LTD.

**(b) COUNTY OF RESIDENCE OF FIRST LISTED** Medina, MN

**PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Hershey, PA

(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
Robert J. Gralewski, Jr.
GERGOSIAN & GRALEWSKI LLP
655 West Broadway, Suite 1410
San Diego, CA 92101
(619) 237-9500

ATTORNEYS (IF KNOWN)

'08 CV 0594 JS CAB

## II. BASIS OF JURISDICTION (PLACE AN X IN ONE BOX ONLY)

- 1 U.S. Government Plaintiff
- X 3 Federal Question (U.S. Government Not a Party)
- 2 U.S. Government Defendant
- 4 Diversity (Indicate Citizenship of Parties in Item III

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX
(For Diversity Cases Only)                FOR PLAINTIFF AND ONE BOX FOR DEFENDANT

| | PT | DEF | | PT | DFF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated or Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 5 | 6 |

## IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).

Violation of Section 1 of the Sherman Act (15 U.S.C. § 1). Manufacturers of chocolate have conspired to fix, raise, maintain and/or stabilize prices of chocolate.

## V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| | PERSONAL INJURY | PERSONAL INJURY | | | |
| 110 Insurance | 310 Airplane | 362 Personal Injury-Medical Malpractice | 610 Agriculture | 422 Appeal 28 USC 158 | 110 400 State Reappointment |
| 120 Marine | 315 Airplane Product Liability | 365 Personal Injury-Product Liability | 620 Other Food & Drug | 423 Withdrawal 28 USC 157 | X 10 Antitrust |
| 130 Miller Act | 320 Assault, Libel & Slander | | 625 Drug Related Seizure of Property 21 USC881 | PROPERTY RIGHTS | 430 Banks and Banking |
| 140 Negotiable Instrument | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 630 Liquor Laws | 820 Copyrights | 450 Commerce/ICC Rates/etc. |
| 150 Recovery of Overpayment &Enforcement of Judgment | 340 Marine | PERSONAL PROPERTY | 640 RR & Truck | 830 Patent | 460 Deportation |
| 151 Medicare Act | 345 Marine Product Liability | 370 Other Fraud | 650 Airline Regs | 840 Trademark | 470 Racketeer Influenced and Corrupt Organizations |
| 152 Recovery of Defaulted Student Loans (Excl. Veterans) | 350 Motor Vehicle | 371 Truth in Lending | 660 Occupational Safety/Health | SOCIAL SECURITY | 810 Selective Service |
| 153 Recovery of Overpayment of Veterans Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 690 Other | 861 HIA (1395ff) | 850 Securities/Commodities Exchange |
| 160 Stockholders Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | LABOR | 862 Black Lung (923) | 875 Customer Challenge 12 USC |
| 190 Other Contract | | | 710 Fair Labor Standards Act | 863 DIWC/DIWW (405(g)) | 891 Agricultural Acts |
| 195 Contract Product Liability | | | 720 Labor/Mgmt. Relations | 864 SSID Title XVI | 892 Economic Stabilization Act |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | 730 Labor/Mgmt. Reporting & Disclosure Act | 865 RSI (405(G)) | 893 Environmental Matters |
| 210 Land Condemnation | 441 Voting | 510 Motions to Vacate Sentence Habeas Corpus | 740 Railway Labor Act | FEDERAL TAX SUITS | 894 Energy Allocation Act |
| 220 Foreclosure | 442 Employment | 530 General | 790 Other Labor Litigation | 870 Taxes (U.S. Plaintiff of Defendant) | Freedom of Information Act |
| 230 Rent Lease & Ejectment | 443 Housing/Accommodations | 535 Death Penalty | 791 Empl Ret. Inc. Security Act | 871 IRS – Third Party 26 USC 7609 | 900 Appeal of Fee Determination Under Equal Access to Justice |
| 240 Tort to Land | Welfare | 540 Mandamus & Other | | | 950 Constitutionality of State |
| 245 Tort to Product Liability | Other Civil Rights | 550 Civil Rights | | | 890 Other Statutory Actions |
| 290 All Other Real Property | | 555 Prisoner Conditions | | | |

## VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)

X 1 Original Proceeding   2 Removal from State Court   3 Remanded from Appellate Court   4 Reinstated or Reopened   5 Transferred from another district (specify)   6 Multidistrict Litigation   7 Appeal to District Judge from Magistrate Judgment

| VII. REQUESTED IN COMPLAINT: | X CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23 | DEMAND $ | Check YES only if demanded in complaint: JURY DEMAND: X YES • NO |
|---|---|---|---|

VIII. RELATED CASE(S) IF ANY (See Instructions): JUDGE                    Docket Number

DATE April 1, 2008                    SIGNATURE OF ATTORNEY OF RECORD

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

149245  $350 SO 4/1/08

# UNITED STATES
# DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

## # 149245    — SH

## April 01, 2008
## 14:46:39

### Civ Fil Non-Pris
USAO #.: 08CV0594
Judge..: JANIS L. SAMMARTINO
Amount.:                    $350.00 CK
Check#.: BC5807

Total—> $350.00

FROM: JACOBS V. THE HERSHEY CO ET AL